ORAL ARGUMENT NOT YET SCHEDULED

No. 25-5042

_____

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

_____

SLASH CREEK WATERWORKS, INC.,
TILMAN GRAY, doing business as Avon Seafood,
ANTONIO GIAMBANCO, and J. RYAN SPECKMAN,

*Plaintiffs-Appellants*,

v.

HOWARD W. LUTNICK, in his official capacity as Secretary of
Commerce, and NATIONAL MARINE FISHERIES SERVICE,

*Defendants-Appellees*.

_____

On appeal from the United States District Court for the District of Columbia
No. 1:23-cv-1755-RC (Hon. Rudolph Contreras)

_____

**OPENING BRIEF OF APPELLANTS**

_____

SETH L. ATKINSON
Quillback Consulting
540 Meder Street
Santa Cruz, CA 95060
(203) 331-2792
seth@quillbackconsulting.com

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to D.C. Circuit Rule 28(a)(1), Plaintiffs-Appellants certify the following information:

### A.    Parties and Amici

Plaintiffs-Appellants in this case are Slash Creek Waterworks, Inc., Tilman Gray doing business as Avon Seafood, Antonio Giambanco, and J. Ryan Speckman.

At the District Court level, J & C Charters LLC participated as an additional Plaintiff.  J & C Charters LLC initially was included as a Plaintiff-Appellant in the instant appeal, but subsequently J & C Charters LLC requested and received termination as a party for reasons unrelated to the content of this litigation.  *See Slash Creek Waterworks, Inc. v. Lutnick*, No. 25-5042 (May 9, 2025) (order terminating party and amending briefing schedule), Doc. 2115227.

Defendants-Appellees in this case are Howard W. Lutnick,[1] in his official capacity as Secretary of Commerce, and the National Marine Fisheries Service.

### B.    Rulings Under Review

The rulings under review are an Order and accompanying Memorandum Opinion that were entered by the United States District Court for the District of

---

[1] Howard W. Lutnick has been substituted for Gina M. Raimondo pursuant to Fed. R. App. P. 43(c)(2).

Columbia (Hon. Rudolph Contreras) on January 31, 2025, in case no. 1:23-cv-1555-RC (ECF Nos. 43 and 44 in the District Court).

## C.    Related Cases

This case has not previously been before this Court or any court other than the U.S. District Court for the District of Columbia, from which this appeal was taken.  Counsel for Plaintiffs-Appellants is not aware of any related cases pending in this Court or any other court.

While not technically a related case, Plaintiffs-Appellants filed a new lawsuit in the U.S. District Court for the District of Columbia on July 3, 2025. That case raises the same arguments that are posed in this appeal, but challenges Amendment 59, which is Defendants-Appellees' most recent management action for South Atlantic red snapper.  *See Slash Creek Waterworks, Inc. v. Lutnick*, No. 25-cv-2140 (D.D.C.).  The new case will be stayed until the resolution of this appeal; it is solely a backup vehicle for pursuing the same arguments, should this appeal be resolved without reaching the merits.

/s/ Seth Atkinson
SETH L. ATKINSON

*Attorney for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and D.C. Circuit Rules 26.1 and 28(a), Plaintiffs-Appellants submit the following statement regarding corporate ownership:

Plaintiff-Appellant Slash Creek Waterworks, Inc. ("Slash Creek") is a private commercial fishing company. Slash Creek has no parent corporation, nor does any publicly held corporation own ten percent or more of its shares.


Dated: July 28, 2025                    /s/ Seth Atkinson_____
                                        SETH L. ATKINSON
                                        CADC Bar No. 65869
                                        Quillback Consulting
                                        348 Nobel Drive
                                        Santa Cruz, CA 95060
                                        (203) 331-2792
                                        seth@quillbackconsulting.com

                                        *Attorney for Plaintiffs-Appellants*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............. I

CORPORATE DISCLOSURE STATEMENT ........................................... III

TABLE OF AUTHORITIES .................................................. VI

GLOSSARY .................................................................. X

STATEMENT OF JURISDICTION ........................................... 1

STATEMENT OF ISSUES PRESENTED .................................... 2

STATEMENT OF RELEVANT STATUTES AND REGULATIONS ..................... 2

STATEMENT OF THE CASE ............................................... 3

I.      Introduction ................................................ 3

II.     Legal Background ........................................... 6

        A.      The Magnuson-Stevens Act Framework.............................. 6

        B.      2006 Amendments: Annual Catch Limits and Accountability
                Measures for All Federal Fisheries ........................ 8

III.    Factual Background ......................................... 9

        A.      Red Snapper and the South Atlantic Snapper-Grouper Fishery............ 9

        B.      The Problem of Increasing Recreational Dead Discards ................ 12

        C.      Amendment 43: An Annual Catch Limit Mechanism that
                Excludes Dead Discards .................................. 13

        D.      Changes to the Numerical Value of the Catch Limit During
                and After District Court Litigation...................... 16

IV.     Proceedings Below ......................................... 19

        SUMMARY OF ARGUMENT .............................................. 21

ARGUMENT ...........................................................................................23

I.    Standard of Review ........................................................................23

II.   As a Factual Matter, the Service's Annual Catch Limit Mechanism
      Does Not Constrain Dead Discards of South Atlantic Red Snapper ...........24

      A.    Nothing in the Annual Catch Limit Mechanism Serves to
            Limit Dead Discards to Any Particular Level ....................................26

      B.    Stock Assessments and Other Upstream Calculations Do Not
            Constrain On-The-Water Fishing Activity ...........................................28

III.  The Text, Structure, and History of 16 U.S.C. § 1853(a)(15)
      Speak Clearly to the Situation at Hand .........................................34

      A.    Annual Catch Limits are a Freestanding Requirement, Not
            Just a Restatement of the Act's Prohibition on Overfishing ..............34

      B.    An Annual Catch Limit Mechanism Must Actually "Limit[]"
            the "Catch" of a Stock ..........................................................38

      C.    An Annual Catch Limit Mechanism Must Be Able To
            Do the Work of Preventing Overfishing .............................................40

IV.   The Service's Annual Catch Limit for South Atlantic Red Snapper
      Fails to Comply with 16 U.S.C. § 1853(a)(15) ...............................42

V.    The *A.P. Bell* Case Should Not Determine the Outcome Here .....................44

VI.   The 1990 Amendments Render This Case Timely .......................................56

CONCLUSION ......................................................................................57

CERTIFICATE OF COMPLIANCE .......................................................59

ADDENDUM ................................................................................. A-1

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*A.P. Bell Fish Co. v. Raimondo*,
    94 F.4th 60 (D.C. Cir. 2024).............................................22, 44, 46, 47, 49, 53

*A.P. Bell Fish Co. v. Raimondo*,
    No. 22-cv-1260-TJK (D.D.C. Jan. 6, 2023)...............................44, 45, 49, 56

*American Hospital Association v. Becerra*,
    142 S. Ct. 1896 (2022) .................................................................................38

*Atlantic City Electric Co. v. FERC*,
    295 F.3d 1 (D.C. Cir. 2002).........................................................................44

*Burrage v. United States*,
    571 U.S. 204 (2014) .....................................................................................44

*Chung v. U.S. Department of Justice*,
    333 F.3d 273 (D.C. Cir. 2003)....................................................................55

* *Conservation Law Foundation v. Pritzker*,
    37 F. Supp. 3d 254 (D.D.C. 2014)........................................9, 37, 38, 44, 51

*Food & Drug Administration v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .....................................................................................24

*Gulf Fishermen's Association v. Gutierrez*,
    529 F.3d 1321 (11th Cir. 2008) ...................................................................57

*Illinois State Board of Elections v. Socialist Workers Party*,
    440 U.S. 173 (1979) .....................................................................................55

*Li v. Commissioner of Internal Revenue*,
    22 F.4th 1014 (D.C. Cir. 2022)....................................................................54

*Loper Bright Enterprises v. Raimondo*,
    144 S. Ct. 2244 (2024) ................................................................23, 24, 34, 56

*Merit Management Group v. FTI Consulting, Inc.*,
    583 U.S. 366 (2018) .....................................................................................24

*Natural Resources Defense Council, Inc. v. Daley*,
    209 F.3d 747 (D.C. Cir. 2000).....................................................................23

*Natural Resources Defense Council, Inc. v. EPA*,
  643 F.3d 311 (D.C. Cir. 2011) ..................................................44

*Natural Resources Defense Council, Inc. v. National Marine Fisheries Service*,
  71 F. Supp. 3d 35 (D.D.C. 2014)...............................................39

* *Oceana, Inc. v. Locke*,
  670 F.3d 1238 (D.C. Cir. 2011) .........................................23, 44

*Oceana, Inc. v. Locke*,
  831 F. Supp. 2d 95 (D.D.C. 2011)............................................45

*Oceana, Inc. v. Raimondo*,
  No. 5:21-cv-05407-VKD (N.D. Cal. Apr. 22, 2024)...................36

* *Oregon Trollers Association v. Gutierrez*,
  452 F.3d 1104 (9th Cir. 2006) ..................................................57

*Snyder v. United States*,
  144 S. Ct. 1947 (2024) .............................................................24

*Theodore Roosevelt Conservation Partnership v. Salazar*,
  661 F.3d 66 (D.C. Cir. 2011) ....................................................23

*United States v. Weaver*,
  808 F.3d 26 (D.C. Cir. 2015) ....................................................54

\* Authorities upon which we chiefly rely are marked with an asterisk.

**Statutes**                                                            **Page**

5 U.S.C. § 706 ...................................................................1, 23

16 U.S.C. § 1801(b)..................................................................6

16 U.S.C. § 1802(34).................................................................7

16 U.S.C. § 1802(42)...............................................................41

16 U.S.C. § 1851(a).............................................................7, 19

16 U.S.C. § 1852(a)..................................................................6

16 U.S.C. § 1852(h)..................................................................6

16 U.S.C. § 1853(a).........................................................7, 19, 40

16 U.S.C. § 1853(a)(15) ............................................................................

.........................2, 3, 19, 21, 22, 34, 35, 38, 39, 40, 41, 42, 43, 45, 47, 49, 52, 54, 55

16 U.S.C. § 1853(c) ...........................................................................6

16 U.S.C. § 1853 note ..................................................................36, 37

16 U.S.C. § 1854(a) ...........................................................................6

16 U.S.C. § 1854(b) ...........................................................................6

16 U.S.C. § 1854(d) ..........................................................................40

16 U.S.C. § 1855(c) ..........................................................................17

16 U.S.C. § 1855(d) ......................................................................6, 17

16 U.S.C. § 1855(f) ...........................................1, 2, 7, 8, 16, 23, 57

16 U.S.C. § 1856 note ......................................................................40

16 U.S.C. § 1861(d) ...........................................................................1

28 U.S.C. § 1291 ...............................................................................1

28 U.S.C. § 1331 ...............................................................................1

28 U.S.C. § 1361 ...............................................................................1

44 U.S.C. § 1507 .............................................................................10

Fishery Conservation and Management Act of 1976,
        Pub. L. No. 94–265, 90 Stat. 331 ......................................35

Fishery Conservation Amendments of 1990,
        Pub. L. No. 101–627, 104 Stat. 4436 .................................57

Sustainable Fisheries Act of 1996,
        Pub. L. No. 104–297, 110 Stat. 3559 .................................35

Magnuson-Stevens Fishery Conserv. and Mgmt. Reauthorization Act of 2006,
        Pub. L. No. 109–479, 120 Stat. 3575 (Jan. 12, 2007) ...............8, 37

**Other Authorities**                                                    **Page**

50 C.F.R. § 600.310(e) .........................................................7, 30, 41, 45

50 C.F.R. § 600.310(f) ..........................................................30, 31, 39

50 C.F.R. § 600.310(g) ...................................................................51

50 C.F.R. § 622.188(a) ..................................................................27

50 C.F.R. § 622.193(y) ..............................................15, 19, 25, 26, 42, 57

75 Fed. Reg. 76,874 (Dec. 9, 2010).................................................10

77 Fed. Reg. 51,939 (Aug. 28, 2012) ..............................................11

79 Fed. Reg. 32,496 (June 5, 2014).................................................11

84 Fed. Reg. 7827 (Mar. 5, 2019)...................................................16

85 Fed. Reg. 36,165 (June 15, 2020)...............................................16

86 Fed. Reg. 30,393 (June 8, 2021).................................................16

87 Fed. Reg. 31,190 (May 23, 2022)................................................16

90 Fed. Reg. 24,527 (June 11, 2025)................................................18, 19, 43

Fed. R. App. P. 4(a)(1)(B)................................................................2

Fed. R. Evid. 201(b) .....................................................................10

D.C. Circuit Local Rule 36(d) ........................................................54

U.S. Court of Appeals for the D.C. Circuit, Policy Statement
    on *En Banc* Endorsement of Panel Decisions (Jan. 17, 1996) ...............55, 56

S. Rep. No. 109–229 (2006)...............................8, 34, 35, 36, 37, 38, 39

151 Cong. Rec. S12840 (daily ed. Nov. 15, 2005)...........................35, 39

Southeast Fisheries Science Center,
    Update of SEDAR73 Assessment (Dec. 2024) ............................18

Merriam-Webster Online Dictionary, "Limit,"
    https://www.merriam-webster.com/dictionary/limit ....................38

# GLOSSARY

| | |
|---|---|
| Plaintiffs | Plaintiffs-Appellants Slash Creek Waterworks, Inc., Tilman Gray d/b/a Avon Seafood, Antonio Giambanco, and J. Ryan Speckman |
| The Service | Defendants-Appellants National Marine Fisheries Service and Howard W. Lutnick |
| J.A. | Joint Appendix |
| APA | Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* |
| Magnuson-Stevens Act (the Act) | Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801 *et seq.* |

## STATEMENT OF JURISDICTION

The district court had subject-matter jurisdiction under the Magnuson-Stevens Fishery Conservation and Management Act ("Magnuson-Stevens Act" or "the Act"), 16 U.S.C. §§ 1855(f), 1861(d), as well as under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1361 (mandamus jurisdiction). Plaintiffs-Appellants Slash Creek Waterworks, Tilman Gray, Antonio Giambanco, and J. Ryan Speckman (collectively "Plaintiffs") challenged an action and a regulation promulgated under the Magnuson-Stevens Act, and the district court applied judicial review pursuant to the standards established in the Administrative Procedure Act ("APA"), *see* 16 U.S.C. § 1855(f); 5 U.S.C. § 706.  Plaintiffs had standing to challenge the regulations because their livelihoods depend in part on the commercial harvest of South Atlantic red snapper, which is the subject of regulation.  *See* ECF 11-3 to 11-7 (standing declarations).  While Defendants-Appellees National Marine Fisheries Service and Howard Lutnick (collectively "the Service") disputed the timeliness of Plaintiffs' claims, the district court found timeliness was not jurisdictional under the Magnuson-Stevens Act and declined to rule on the issue. *See* J.A._____ (ECF 44 at 25–26).

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291. Plaintiffs appealed from an Order and accompanying Memorandum Opinion that constitute a final judgment disposing of all Plaintiff's claims, which were entered

by the district court on January 31, 2025.  *See* JA_____ (ECF 43, 44).  Plaintiffs

noticed this appeal on February 20, 2025, *see* ECF 45, rendering the appeal timely,

*see* Fed. R. App. P. 4(a)(1)(B).


## STATEMENT OF ISSUES PRESENTED

1.     When dead discards comprise the overwhelming majority of catch for

a stock, does it satisfy Congress's requirement to "establish a mechanism for

specifying annual catch limits . . . at a level such that overfishing does not occur in

the fishery, including measures to ensure accountability," 16 U.S.C § 1853(a)(15),

to establish an annual catch limit mechanism that only governs landings and not

dead discards?

2.     Should this Circuit join the two other circuits that have recognized

Congress meant what it said when it amended the Magnuson-Stevens Act in 1990,

allowing challenges to "regulations" promulgated under the Act at later points in

time—specifically, when those "regulations" are implemented via an "action" as

defined in 16 U.S.C. § 1855(f)(2)?


## STATEMENT OF RELEVANT STATUTES AND REGULATIONS

Pertinent provisions of the Magnuson-Stevens Act, and regulations

promulgated thereunder, are set forth in an addendum at the end of this brief.

## STATEMENT OF THE CASE

### I.    Introduction

In 2006, Congress responded to chronic overfishing in our nation's fisheries by mandating the use of annual catch limits.  The requirement was clear and direct: managers must "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  16 U.S.C. § 1853(a)(15).

Congress considered making annual catch limits optional and, over the objection of some stakeholders, rejected that approach.  Three decades of watching managers fail to rein in overfishing was enough:  going forward, catch limits would be a mandatory tool for all fisheries.  The goal remained the same— stopping overfishing—but now the means would be prescribed, along with the ends.

It was understood that the new requirement for annual catch limits would mean changing how some fisheries were managed.  The Service would need to develop new data streams, new methodologies, and new approaches to management.  Congress accordingly provided a grace period of three to four years before the new requirement would become effective, as well as funding to improve both science and management.

In most fisheries nationwide, the new requirement was greeted with action. Scientists performed analyses, managers reviewed different options and consulted stakeholders, and the Service operationalized annual catch limits successfully by the 2010/2011 deadline.  And overfishing dropped markedly in the subsequent years.

In a few fisheries, however, rather than taking up Congress's challenge, managers dragged things out with half-measures and ineffective implementation, and never actually solved the problem of overfishing.  The South Atlantic snapper-grouper fishery is one of those.

Today, nearly twenty years after Congress amended the law, the Service is using an annual catch limit for South Atlantic red snapper that is set in terms of landings only.  Dead discards represent the overwhelming majority of catch for red snapper—around ninety percent—yet they remain unlimited and unaccountable under the Service's annual catch limit.  And predictably, with most of the catch not being managed under the Service's annual catch limit, fishing mortality remains too high and the red snapper stock is chronically subject to overfishing.

Plaintiffs in this case are commercial fishermen, fish buyers, and fish processors.  Plaintiffs and their colleagues are responsible for relatively few dead discards of red snapper.  The recreational sector, by contrast, has grown steadily over the years in both participation and fishing power, and recreational dead

discards have grown proportionally. Today, the recreational sector is responsible for around ninety-eight percent of all dead discards.

With ever-increasing dead discards, the Service has progressively reduced the allowable landings for both sectors—trying (unsuccessfully) to keep total fishing mortality under control. In essence, commercial landings are being squeezed to extremely low levels because of ballooning recreational dead discards. And this dynamic exists precisely because the Service has failed to set a limit on dead discards of red snapper, as it is required to do by law.

A successful outcome in this case would lead to dead discards being managed within the annual catch limit mechanism. Each sector would be accountable for its own fishing activity, and Plaintiffs no longer would be "paying the bills" for the recreational sector's dead discard problem. Commercial fishermen finally would be able to benefit from their own sustainable fishing activity, and in all likelihood they would see increased harvest opportunities for red snapper.

Increased opportunity would be a lifeline for Plaintiffs and other commercial fishermen in the South Atlantic. Snapper-grouper fishing is barely a viable enterprise at present; most commercial fishing operations are small-boat fishermen who get by on extremely low net revenues. Increased revenue from red snapper would help them keep up with infrastructure and maintenance needs, instead of

5

deferring these things and ending up in an increasingly marginal economic existence.

Finally and more broadly, fixing the annual catch limit mechanism is critical for ensuring the long-term health of the red snapper stock. The current approach of allowing unlimited and unaccountable dead discards is making it impossible to manage the stock sustainably. And because commercial fishermen's fates in the long run are tied to the natural resource, fixing this problem is vital to Plaintiffs' long-term survival.

## II.    Legal Background

### A.    The Magnuson-Stevens Act Framework

Congress enacted the Magnuson-Stevens Act in 1976, "to conserve and manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1). The Act establishes eight regional fishery management councils, which are tasked with preparing fishery management plans, plan amendments, and implementing regulations for fisheries within their respective jurisdictions. *See* 16 U.S.C. §§ 1852(a), (h)(1), 1853(c) The Secretary of Commerce, acting through the Service, reviews and approves all recommended plans and regulations to ensure they comply with the law, *id.* § 1854(a)–(b), and upon approval, implements them, *id.* §§ 1854(b)(3), 1855(d).

The Act requires fishery management plans and regulations to be consistent with ten "National Standards" for conservation and management. *Id.* § 1851(a). National Standard 1 requires that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery." *Id.* § 1851(a)(1).

The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by the Service clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., removing fish from the water at an unsustainable rate), whereas "overfished" refers to when a population of fish is below a level at which it can produce maximum sustainable yield on a continuing basis (i.e., having too few fish in the water). *See* 50 C.F.R. § 600.310(e)(2)(i).

Other National Standards address science, coordination, allocations, efficiency, contingencies, costs, fishing communities, bycatch, and safety of human life at sea. 16 U.S.C. § 1851(a)(2)–(10). In addition to the National Standards, the Magnuson-Stevens Act provides direct requirements for fishery management plans. *Id.* § 1853(a).

The Act provides for judicial review of fishery management regulations and actions "in accordance with" the APA. *Id.* § 1855(f)(1). Petitions for judicial

7

review must be filed within 30 days of a regulation's promulgation or an action's publication in the Federal Register. *Id.*

**B.    2006 Amendments:  Annual Catch Limits and Accountability Measures for All Federal Fisheries**

By the turn of the 21st Century, overfishing remained a problem in many federally-managed fisheries.  Congress had strengthened the Act's conservation requirements through amendments in the 1980s and 1990s, adding mandatory rebuilding plans and habitat protection, clarifying that Optimum Yield must be precautionary, and reiterating the need to stop overfishing.  Yet the Service and the councils still struggled to end overfishing.

Congress responded in 2006, amending the Act to require annual catch limits in all federal fisheries.  Fishery management plans now must "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability."  Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), *codified at* 16 U.S.C. § 1853(a)(15).

Annual catch limits are numerical limits on the allowable catch of a fish stock in a given year.  The idea is to set science-based limits ahead of time, and then stay accountable to those limits.  *See, e.g.*, S. Rep. No. 109–229, at 24 (2006) (noting the new requirement would mean "establishing an annual catch limit before the fishery season begins and managing to that limit").

8

This form of budgeting and accountability represented a radical change for many fisheries, which for decades had been managed with no meaningful consequences. The new legal mandate "fundamentally altered American fishing regulation by requiring [managers] to set hard, science-based caps on how many fish could be caught each year and by demanding that accountability measures be triggered when fishermen exceeded those caps." *Conserv. Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

## III.    Factual Background

### A.    Red Snapper and the South Atlantic Snapper-Grouper Fishery

Red snapper (*Lutjanus campechanus*) is a highly valued marine fish whose distribution in U.S. waters extends from the Gulf of Mexico to Cape Hatteras, North Carolina. Red snapper live on the continental shelf, with juveniles inhabiting shallow nearshore waters and adults occupying deeper areas of structured bottom. Individuals can live for over fifty years, and grow to a size of 40 inches and 50 pounds. *See generally* J.A.\_\_\_\_\_ (AR006880–81).

Federal management of the snapper-grouper fishery began in 1983, when the Service approved the original Snapper-Grouper Fishery Management Plan ("the Plan"). *See* J.A.\_\_\_\_\_ (SAR012358–59). At that time red snapper already was understood to be subject to overfishing (i.e., the rate of fishing was unsustainably

9

high), so the Plan provided a minimum size limit in an attempt to reduce mortality rates. *See* J.A._____ (SAR012359). High landings continued through the 1980s, however, and the stock declined to a low population level by 1990. *See* J.A._____ (SAR012095). The Service introduced a handful of further measures in 1991, and established a time period of 15 years to rebuild red snapper to healthy levels. *See* J.A._____ (SAR011962).

In 2008, after the rebuilding deadline had come and gone, the Service conducted a new stock assessment of South Atlantic red snapper and found it still was subject to overfishing (i.e., fish were being removed from the population too rapidly) and still was overfished (i.e., the population size was too small). *See* 75 Fed. Reg. 76,874 (Dec. 9, 2010).[2] The Service responded by prohibiting any landings of red snapper, and setting a new rebuilding timeframe of 35 years— meaning the stock would be rebuilt by the year 2044. *See* J.A._____ (SAR012359–60).

In 2013, after another stock assessment, the Service adopted Amendment 28 to the Plan. Amendment 28 established a new annual catch limit mechanism for red snapper that would allow landings under some circumstances. *See* J.A._____

---

[2] Plaintiffs cite to a few Federal Register publications that are not contained in the Joint Appendix or Administrative Record. These citations are solely intended as background information; they are judicially noticeable under 44 U.S.C. § 1507 and Federal Rule of Evidence 201(b)(2).

(AR010253–57) (final rule) ("Amendment 28"). Specifically, red snapper landings were allowed in a year if the total catch (landings plus dead discards) from the prior year did not exceed the acceptable biological catch (a number set using projections from the most recent stock assessment). *Id.*

Also around this time, the Service established a formal allocation ratio for red snapper, at 28.07% commercial and 71.93% recreational, which would be applied to annual catch limits going forward. *See* J.A._____ (SAR012360).

Using the Amendment 28 annual catch limit mechanism and the new allocation ratio, the Service allowed landings of red snapper in 2012, 2013, and 2014. *See* 77 Fed. Reg. 51,939 (Aug. 28, 2012) (2012 season); J.A._____ (AR010253) (2013 season provided in Amendment 28); 79 Fed. Reg. 32,496 (June 5, 2014) (2014 season).

In 2015, however, landing red snapper was prohibited. Directed fishing was not allowed because in the preceding year, total catch had exceeded the acceptable biological catch. *See* J.A._____ (AR010258). This occurred again in 2016, which was remarkable because there had been no open season the prior year; it meant the level of dead discards had exceeded the acceptable biological catch on its own, with no appreciable contribution from landings. *See id.* And again in 2017, the same thing happened. *Id.*

11

**B.    The Problem of Increasing Recreational Dead Discards**

Red snapper is part of a mixed-species assemblage that is subject to recreational fishing throughout the year.  Individual species within the assemblage may be "closed" to fishing for periods of time, but that just means anglers cannot retain the species.  Because there is virtually always a species in the bottomfish assemblage that is "open" and can be kept, people go recreational bottomfishing year-round.

When people go bottomfishing in the South Atlantic, they often catch and bring up red snapper.  This is true whether or not they intend to; even when targeting different species, red snapper are caught because they are relatively common and they co-occur with other targeted species.  *See, e.g.*, J.A._____ (SAR012363) (noting this dynamic).

Most of these recreationally caught red snapper are discarded because the South Atlantic red snapper season is only "open" for a few days each year.  *See id.*; J.A._____ (AR000001) (two-day season in 2023).  And some percentage of the discarded red snapper end up dying—from poor handling practices, barotrauma, shark predation, or other reasons.  *See, e.g.*, J.A._____ (SAR012042) (discard mortality rates).

This catch-and-discard cycle happens at a massive scale in the recreational fishery.  In the South Atlantic, the recreational fishery is open access and

12

constantly growing. There are millions of hooks going in the water and catching red snapper, and the vast majority of those fish are discarded. Even though only a subset of discarded fish end up dying, the high level of recreational fishing effort means that a large number of South Atlantic red snapper are removed from the population as dead discards each year. *See, e.g.*, J.A.\_\_\_\_\_ (SAR012057) (hundreds of thousands of recreational dead discards in recent years).

Because there is no specific limit on the amount of red snapper dead discards allowed in a given year, they simply increase in proportion to fishing effort in the recreational snapper-grouper fishery. And recreational fishing effort has increased substantially in recent decades due to population growth and increased participation, combined with higher fishing power from new technologies like GPS, stationary idling systems, fish finders, more powerful boats. As a result, recreational dead discards today represent the dominant source of mortality for South Atlantic red snapper. *See, e.g.*, J.A.\_\_\_\_\_ (SAR012363) (noting "[o]verfishing is being largely driven by dead discards in the recreational sector").

## C.    Amendment 43: An Annual Catch Limit Mechanism that Excludes Dead Discards

By 2017, a new stock assessment for South Atlantic red snapper had been released, and the assessment once again found the stock subject to overfishing (i.e., rate of removals was too high) as well as overfished (i.e., population remaining was too small). *See* J.A.\_\_\_\_\_ (AR002770). By this point it was well-known that

"the majority of the estimated fishing mortality [for red snapper] occurred from estimated dead discards." J.A._____ (AR010259).

But because the new stock assessment showed a modest uptick in red snapper abundance, the Service decided that resuming landings of red snapper was "not likely to result in overfishing." *Id.* The Service in turn approved Amendment 43, which removed the existing annual catch limit mechanism and replaced it with a new mechanism—a simple recurring amount of allowable landings. *See* J.A._____ (AR010022–29) (final rule) ("Amendment 43").

The Service acknowledged that dead discards were a major source of mortality for red snapper. *See*, *e.g.*, J.A._____ (AR006826) ("Discard mortality, particularly from the recreational sector, continues to be a significant source of overall mortality for red snapper."); J.A._____ (AR007173) ("[M]ost of the catch is now discarded . . . ."); J.A._____ (AR006981) ("Since 2010, estimates of dead discards have accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species.").

The new annual catch limit mechanism established in Amendment 43, however, did not regulate dead discards. Instead, it eliminated the aspect of the prior annual catch limit mechanism that had at least indirectly even *considered* dead discards. Going forward, dead discards would be left out of the catch limit mechanism entirely. *See* J.A._____ (AR010029) (establishing new regulatory

14

language at 50 C.F.R. § 622.193(y), and replacing the portions of text that had, under Amendment 28, required calculation of total catch in prior year before allowing landings in current year).

The Service originally described Amendment 43 as a package that would revise the annual catch limit mechanism and also establish separate management measures designed to reduce dead discards. *See* J.A._____ (AR006826) (notice of intent to prepare EIS) ("[T]he Council is considering methods to reduce discard mortality in Amendment 43 including spatial and temporal closures (where harvest of all snapper-grouper species would be prohibited), changes to allowable fishing gear types (e.g., circle hooks), and requiring the use of descending devices and/or venting tools for released fish.").

The Service dropped such measures from the scope of Amendment 43, though, deferring them to some undefined point in the future. *See* J.A._____ (AR006834) (revised notice of intent to prepare EA) ("[T]he Council decided to reduce the scope of actions considered in Amendment 43. The amendment now would only modify the process implemented through Amendment 28 by revising the process to determine the commercial and recreational [annual catch limits] for red snapper. The Council may consider the other actions specified in the NOI in a future amendment.").

Amendment 43 was implemented via temporary rules in 2019, 2020, and 2021.  In each of these actions, the Service applied the recurring landings limit, used the allocation ratio to divide it between commercial and recreational sectors, and calculated the season lengths for that year.  *See* 84 Fed. Reg. 7827 (Mar. 5, 2019); 85 Fed. Reg. 36,165 (June 15, 2020); 86 Fed. Reg. 30,393 (June 8, 2021).

In 2021, a new stock assessment was completed for South Atlantic red snapper.  That assessment, referred to as SEDAR 73, once again found red snapper to be subject to overfishing (i.e., fish being killed too rapidly) and overfished (i.e., spawning stock biomass too low).  *See* J.A.\_\_\_\_\_ (SAR012002).  And again, scientists concluded that "the primary driver of overfishing is recreational discards."  *Id.*

The Service continued to implement Amendment 43 after SEDAR 73, publishing temporary rules in the Federal Register for 2022 and 2023.  *See* 87 Fed. Reg. 31,190 (May 23, 2022); J.A.\_\_\_\_\_ (AR000001–02) (temporary rule for 2023, herein "2023 Temporary Rule").  Plaintiffs filed suit to challenge the last of these implementation actions—the 2023 Temporary Rule—as well as the underlying regulations from Amendment 43, pursuant to 16 U.S.C. § 1855(f)(1)–(2).

### D.    Changes to the Numerical Value of the Catch Limit During and After District Court Litigation

While this case was pending in the district court, the Service issued a new temporary rule for 2024.  J.A.\_\_\_\_\_ (SAR012494–99) ("the 2024 Temporary

Rule"); *see also* J.A.\_\_\_\_\_ (SAR012344–465) (environmental assessment).  The 2024 Temporary Rule modified the numerical value of the red snapper annual catch limit slightly, reducing it to 31,000 landed fish.  J.A.\_\_\_\_\_ (SAR012496).

Other than changed numerical values, the regulatory text established by the 2024 Temporary Rule was identical to the existing regulatory text from Amendment 43.  *See* Addendum at A-11.  Implementation of the catch limit was identical as well.  *See* J.A.\_\_\_\_\_ (SAR012495–96) (allocating landings to the sectors and setting respective seasons).

Because the 2024 Temporary Rule reduced the numerical value of the catch limit, the Service relied on its emergency and interim measure authority (16 U.S.C. § 1855(c)) rather than relying on its general fishery management plan implementation authority (16 U.S.C. § 1855(d)), as it had for its prior temporary rules implementing Amendment 43.  *Compare* J.A.\_\_\_\_\_ (SAR012497) *with* J.A.\_\_\_\_\_ (AR000002).

Plaintiffs supplemented their complaint in the district court to add the 2024 Temporary Rule as a subject of challenge.  The 2024 Temporary Rule was effective for 180 days, and expired on December 12, 2024.  J.A.\_\_\_\_\_ (SAR012494).

Most recently, after the district court issued its final judgment in this case, the Service promulgated Amendment 59 to the Snapper-Grouper Fishery Management Plan, which reduced on a permanent basis the numerical value for the

red snapper annual catch limit.  *See* 90 Fed. Reg. 24,527 (June 11, 2025) (final rule) ("Amendment 59").  The new recurring limit for red snapper landings was set at 34,000 fish.  *Id.* at 24,529.

The new numerical value in Amendment 59 was based on a recently-completed stock assessment update for red snapper.  *See id.* at 24,528–29 (discussing assessment update); *see also* Southeast Fisheries Science Center, Stock Assessment of Red Snapper off the Southeastern United States: Update of SEDAR73 Assessment (Dec. 2024) ("SEDAR 73 Update"), *available at* https://sedarweb.org/documents/sefsc-2024-update-to-sedar-73-south-atlantic-red-snapper-assessment.[3]

The Service acknowledged that, once again, the updated stock assessment "indicates that the stock is still experiencing overfishing," and that "[m]ost of the red snapper fishing mortality is attributed to dead discards in the recreational sector."  90 Fed. Reg. at 24,528.

Nonetheless, the Service maintained the existing annual catch limit mechanism for red snapper—consisting of a recurring limit on landings and corresponding accountability measures for landings.  Aside from the numerical values, the regulatory text as modified by Amendment 59 remains identical to that

---

[3] Plaintiffs provide the citation and URL above only for context.  The results from SEDAR 73 Update are very similar to those from SEDAR 73, so Plaintiffs herein cite to SEDAR 73 via the administrative record.

established by Amendment 43.  *See* 90 Fed. Reg. at 24,539; Addendum at A-11

(comparing versions of 50 C.F.R. § 622.193(y)).  Implementation of the catch limit

mechanism under Amendment 59 was identical to that under Amendment 43 as

well.  *See* 90 Fed. Reg. at 24,529–30 (allocating landings to the sectors and setting

respective seasons).

## IV.    Proceedings Below

Plaintiffs filed suit in the district court on June 16, 2023, alleging three

claims against the 2023 Temporary Rule and Amendment 43.  J.A.\_\_\_\_\_ (ECF 1).

The first two claims alleged closely-related violations[4] of the annual catch limit

requirement, 16 U.S.C. § 1853(a)(15).  Plaintiffs' third claim alleged a violation of

National Standard 4 and other allocation requirements in the Magnuson-Stevens

Act, 16 U.S.C. §§ 1851(a)(4), 1853(a)(14).[5]  Plaintiffs requested, among other

things, declaratory relief, vacatur of Amendment 43 and the 2023 Temporary Rule,

and an order requiring the Service to establish a legally-compliant annual catch

limit for South Atlantic red snapper.  J.A.\_\_\_\_\_ (ECF 1).

The parties briefed cross motions for summary judgment.  J.A.\_\_\_\_\_ (ECF

11 to 11-7, 12 to 12-2, 13 to 13-1, 15, 17 to 17-2).  The *A.P. Bell* case—discussed

---

[4] Those two claims merely represented different sides of the same problem.  They
have been consolidated for purposes of this appeal.

[5] Plaintiffs do not argue the allocation claim on appeal.

at length in Argument V below—was released after the close of briefing, and the parties submitted notices to the court regarding that new authority.  J.A._____ (ECF 19 to 19-2, 20).

The Service issued the 2024 Temporary Rule while the case was briefed and pending before the district court.  Plaintiffs sought and received leave to supplement their complaint to include a challenge to the 2024 Temporary Rule, applying the same three claims.  J.A._____ (ECF 26-3) (supplemented complaint).

The parties briefed new cross-motions for partial summary judgment, addressing the new claims.  J.A._____ (ECF 29, 31) (supplemental record); J.A._____ (ECF 32 to 32-2, 35 to 35-3, 36, 38) (partial summary judgment briefing).

The district court held a hearing on the motions for summary judgment on January 8, 2025.  The court granted summary judgment to the Service in a written order and accompanying memorandum opinion on January 31, 2025.  J.A._____ (ECF 43, 44).  Plaintiffs filed their notice of appeal on February 25, 2025, based on the district court's order and opinion.  J.A._____ (ECF 45).

## SUMMARY OF ARGUMENT

The basics of this case are straightforward.  The Service has established an annual catch limit mechanism for South Atlantic red snapper that does not constrain or limit dead discards to any particular amount.  Dead discards represent around ninety percent of the total catch of red snapper, so failing to cap dead discards means the vast majority of red snapper catch is unconstrained.

Congress spoke clearly when it added the annual catch limit requirement to the Magnuson-Stevens Act in 2006.  The Service must establish annual limits on catch for federally-managed stocks, and must hold itself accountable to those limits.  16 U.S.C. § 1853(a)(15).  Annual catch limits are a mandatory tool Congress prescribed to finally operationalize the Act's longstanding prohibition on overfishing.  It is not optional to use annual catch limits, nor is it a situation where compliance can be overlooked so long as the results turn out okay in hindsight. That sort of backward-looking management was characteristic of federal fisheries pre-2006, and Congress decisively rejected it.

Here, the Service has established a catch limit and accountability measures for only a small portion of South Atlantic red snapper catch, leaving the vast majority of catch subject to pre-2006 management.  This is not legal, nor is it particularly functional, as witnessed by red snapper's chronic overfishing status.  It

is, in fact, precisely the kind of problem Congress intended the annual catch limit mandate to solve.

The only real complication here is that in a prior opinion, *A.P. Bell v. Raimondo*, 94 F.4th 60 (2024), a panel of this Court summarily rejected a similar argument. In two brief paragraphs, without any reference to the traditional tools of statutory interpretation, the *A.P. Bell* panel ruled against the plaintiffs in that case, and may have reached an incorrect conclusion regarding the meaning of the annual catch limit requirement. *Id.* at 65.

If Plaintiffs succeed in our task—showing that the text, structure, and history of 16 U.S.C. § 1853(a)(15) require the Service to manage dead discards within the catch limit mechanism in situations like this—then this Court will be faced with a question of what to do with *A.P. Bell*. It may be that *A.P. Bell* can be distinguished. It also may be inapplicable simply in its summary-ness, as it lacks any clearly articulated principle for application going forward. If not, however, and *A.P. Bell* is viewed as binding precedent, Plaintiffs respectfully believe this could be a situation for an *Irons* footnote. Failing that, Plaintiffs would intend to pursue *en banc* review. This aspect of *A.P. Bell* simply was wrongly decided, and it needs to be cleaned up.

# ARGUMENT

## I.    Standard of Review

On appeal, this Court "review[s] not the judgment of the district court but the agency's action directly, giving 'no particular deference' to the district court's view of the law." *Oceana, Inc. v. Locke*, 670 F.3d 1238, 1240 (D.C. Cir. 2011) (quoting *Natural Res. Def. Council, Inc. v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000)). *See also Theodore Roosevelt Conservation P'ship v. Salazar*, 661 F.3d 66, 72 (D.C. Cir. 2011) (de novo review for appeals of agency judicial review cases).

The Magnuson-Stevens Act incorporates the APA's standard of review, 16 U.S.C. § 1855(f)(1), meaning agency actions must be set aside when they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A).

Because this case primarily turns on statutory interpretation, the Court "must exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024). Specifically, the Court is to "use every tool at [its] disposal to determine the best reading of the statute," without any predetermined level of deference given to agency views. *Id.* at 2266.

The traditional tools of statutory interpretation include analyzing text and context, as well as statutory structure and history. *See, e.g., Merit Mgmt. Group v.*

23

*FTI Consulting, Inc.*, 583 U.S. 366, 378, 381, 382–83 (2018) (unanimous) (text, context, structure, and history); *see also Loper Bright Enters.*, 144 S. Ct. at 2262 ("The text of the APA means what it says.  And a look at its history if anything only underscores that plain meaning."); *Snyder v. United States*, 144 S. Ct. 1947, 1954 (2024) (text, structure, and history); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132–33 (2000) (text, context, structure, and history; also common sense).

## II.    As a Factual Matter, the Service's Annual Catch Limit Mechanism Does Not Constrain Dead Discards of South Atlantic Red Snapper

The Service's annual catch limit mechanism for South Atlantic red snapper consists of a recurring amount of landings to be allowed each year, which is allocated out to the sectors under the governing allocation ratio.  J.A.\_\_\_\_\_ (AR010023).  The commercial sector receives its allocation in pounds and the recreational sector receives its allocation in numbers of fish, as those are the respective units used in each sector to monitor landings.  *Id.*  The remainder of the catch limit mechanism consists of some bare-bones accountability measures, intended to keep each sector from exceeding its landings limit.  J.A.\_\_\_\_\_ (AR010024).  After Amendment 43, the relevant regulatory text read as follows:

(y) Red snapper —

(1) Commercial sector.  The commercial ACL for red snapper is **124,815** lb (**56,615** kg), round weight.  See § 622.183(b)(5) for details on the commercial fishing season.  NMFS will monitor commercial landings during the season, and if commercial landings, as estimated by the SRD, reach or are projected to reach the commercial ACL, the AA will file a notification with the Office of the Federal Register to close the commercial sector for red snapper for the remainder of the year.  On and after the effective date of the closure notification, all sale or purchase of red snapper is prohibited and harvest or possession of red snapper is limited to the recreational bag and possession limits and only during such time as harvest by the recreational sector is allowed as described in § 622.183(b)(5).  This bag and possession limit and the prohibition on sale / purchase apply in the South Atlantic on board a vessel for which a valid Federal commercial or charter vessel / headboat permit for South Atlantic snapper-grouper has been issued, without regard to where such species were harvested or possessed, i.e., in state or Federal waters.

(2) Recreational sector.  The recreational ACL for red snapper is **29,656** fish.  The AA will file a notification with the Office of the Federal Register to announce the length of the recreational fishing season for the current fishing year.  The length of the recreational fishing season for red snapper serves as the in-season accountability measure.  See § 622.183(b)(5) for details on the recreational fishing season.  On and after the effective date of the recreational closure notification, the bag and possession limits for red snapper are zero.

50 C.F.R. § 622.193(y).  Note that the numerical values—in red/bold font above—were changed in subsequent actions, but the rest of the text remains as established in Amendment 43.  *See* Addendum at A-11 (comparing versions of regulatory text).

25

### A.     Nothing in the Annual Catch Limit Mechanism Serves to Limit Dead Discards to Any Particular Level

For present purposes, Plaintiffs can acknowledge that the Service's annual catch limit mechanism does have a limit on landings.  There is a specific number to be allowed each year, and there are measures (season openings/closings, in this case) that serve to constrain fishing activity on the water such that landings do not exceed the pre-specified number.[6]  It is the presence of constraining—or accountability—measures that makes the number function as a limit.  *See generally infra* Argument III.A–B.

What is missing from the Service's annual catch limit mechanism, however, is a limit and accountability measures for dead discards.  The regulatory text lacks any limiting number for dead discards, or any measures that would serve to create accountability—i.e., by regulating fishing activity in such a way as to prevent dead discards from exceeding that number.  *See* 50 C.F.R. § 622.193(y).  There is, in fact, no mention of dead discards at all.  *Id.*  The Service has never asserted that such a limit exists, so this should be essentially undisputed.

It is critical at this point to understand that landings and dead discards are functionally independent in high-effort, landing-constrained recreational fisheries like South Atlantic snapper-grouper.  Each form of catch has to be regulated

---

[6] In reality, the Service's accountability measures routinely fail to constrain landings to the limit, but that is a matter for another day.

separately; constraining one does not inherently constrain the other. *E.g.*, J.A._____ (SAR012454) ("Discards have increased even as the length of the red snapper [open ]seasons decreased over the last three years."). This is because most red snapper dead discards come in the course of fishing activity targeting other species. *See, e.g.*, J.A._____ (SAR012409); *see also supra* Statement of the Case III.B.

What this means is that under the Amendment 43 annual catch limit mechanism, dead discards remain functionally unlimited. In a situation where dead discards comprise around ninety percent of the catch of a stock, *see* J.A._____ (AR006981); J.A._____ (SAR012055, SAR012057), the Service manages dead discards outside the annual catch limit mechanism, *see* J.A._____ (SAR012495) (noting that "reductions in red snapper discards [] would require [separate] action").

Rather than managing dead discards with a limit and accountability, the Service just applies a few measures intended to reduce the rate at which they occur. *See, e.g.*, 50 C.F.R. § 622.188(a) (requiring non-stainless hooks and descending devices). This is pre-2006, or "soft," management: there is no limit on removals, just measures intended to soften (slightly) the impact on the stock from fishing.

**B.     Stock Assessments and Other Upstream Calculations Do Not Constrain On-The-Water Fishing Activity**

For stocks like South Atlantic red snapper, the management process usually begins with the Service conducting a stock assessment. A stock assessment is when scientists incorporate biological data, catch numbers, and other information into a statistical model, and estimate (1) the size of the population (in abundance, biomass, reproductive output, or other units), and (2) how much fishing pressure the population is being exposed to (as an exploitation rate, instantaneous mortality rate, or other unit of measure). Both population size and fishing pressure are then compared to benchmarks that are understood to represent healthy, or sustainable, levels for that population of fish. *See, e.g.*, J.A._____ (SAR011955, SAR012002 (SEDAR 73 stock assessment).

In budgeting terms, stock assessments can be thought of as counting how much money you have. Fish, unlike dollars in a bank, are fugitive resources, so the "budgeting cycle" always begins with counting how much money is currently in your account.

After a stock assessment is completed, the next step is to run catch projections. Projections take the estimated population size as of today and apply a fishing mortality rate that is understood to be sustainable. This results in a numerical value for how much fish can be removed safely from the population in

28

the upcoming years. *See, e.g.*, J.A._____ (SAR008798–852) (draft projections based on SEDAR 73).

In budgeting terms, once you know how much money is in your account and what percentage you can spend safely each year, the next step—projections—is where you solve for the specific dollar amount that you can spend in each of the upcoming years.

Note that in catch projections, the mortality rate applied to the population always represents total catch in the fishery—because a dead fish is a dead fish, whether it comes in the form of landings or dead discards. As such, catch projections produce yield streams that, when taken together, embody the total catch for that stock. For South Atlantic red snapper, for example, catch projections produce a component that represents landings, and a component that represents dead discards. *See, e.g.*, J.A._____ (SAR008805). Together, these represent total catch.

In the budgeting analogy, your calculations must include all types of spending. You may incur both credit card expenditures and cash expenditures, but both come out of the same account. So when you calculate the specific dollar amount that you can spend in each upcoming year, you usually end up calculating separate sub-values for cash and credit card expenditures—which, taken together, represent the safe amount of total spending.

To illustrate, the projections from SEDAR 73—upon which the 2024 Temporary Rule was based—produced two separate yield streams for South Atlantic red snapper, one for landings and one for dead discards:

| Year | Landings (numbers of fish) | Dead Discards (numbers of fish) |
|------|------------------|------------------|
| 2024 | 31,000 | 207,000 |
| 2025 | 33,000 | 210,000 |
| 2026 | 35,000 | 211,000 |
| 2027+ | 36,000 | 212,000 |

J.A._____ (SAR012354) (Table 1.3.2).  The way to read these numbers is that scientists believe if 31,000 fish are landed and 207,000 fish are discarded dead during calendar year 2024, then South Atlantic red snapper will stay at a safe level of fishing mortality (i.e., it will avoid overfishing).  Or phrased slightly differently, scientists are saying that *landing 31,000 fish will be safe in 2024, so long as no more than 207,000 fish are discarded dead*.

Results from catch projections are then passed over to the management side, where they are adopted as an "overfishing limit."  This is a precursor value to the annual catch limit, primarily used for determining when overfishing is occurring.  *See* 50 C.F.R. § 600.310(e)(2)(i)(D).  Managers then reduce that number slightly, providing a buffer to hedge against scientific uncertainty; the resulting value is called the "acceptable biological catch."  *See id.* § 600.310(f)(1)(ii).  Finally,

managers adopt an annual catch limit, which can be set equal to or below the acceptable biological catch depending on whether or not managers want to hedge against any other forms of uncertainty. *See id.* § 600.310(f)(4), (1)(v).

In budgeting terms, this part of the process is just refining your budget numbers—starting with a top-line estimate and reducing it slightly to allow a margin for safety, before adopting the final spending limit that you will operationalize in the upcoming year.

Note that only the final number—the annual catch limit—has any significance for on-the-water management, because it is the number to which accountability measures are calibrated. None of the upstream values—stock assessment outputs, projection yield streams, overfishing limits, or acceptable biological catches—are regulatory in nature.

With all this in mind, it becomes easier to see what the Service is doing with South Atlantic red snapper. They run a stock assessment, *see, e.g.*, J.A._____ (SAR011955–2148) (SEDAR 73), conduct projections, *see* J.A._____ (SAR008817) (31,000 landed fish and 207,000 dead discards for the year 2024), adopt the resulting values as the overfishing limit, and buffer (or not) those values down as needed to get the acceptable biological catch, *see* J.A._____

(SAR012354) (adopting projection values as overfishing limit and acceptable biological catch).  All of this is fine.[7]

The Service then takes the landings component, and enacts it as its annual catch limit for South Atlantic red snapper.  J.A.\_\_\_\_\_ (SAR012495) (establishing annual catch limit for 2024 of 31,000 landed fish).  The dead discard portion drops out, and is never heard from again.  *See* J.A.\_\_\_\_\_ (SAR012314) ("This 2024 temporary rule, similar to the 2023 red snapper season rule, . . . does not specifically address the recreational discard issue.").

So in sum, the agency is:

- Calculating a number of landings via the catch projections, establishing it as the annual catch limit, and calibrating accountability measures to ensure landings do not exceed that number in a given year.

- Calculating a number of dead discards via the catch projections, doing nothing in particular to ensure that dead discards do not exceed that number, and finding out what happened with dead discards in hindsight after completion of the next stock assessment (every 3-6 years or so).

---

[7] In reality, there were many aspects of Amendment 43 and the 2024 Temporary Rule that were not fine—like failing to buffer down the acceptable biological catch in 2024, and making up the annual catch limit value out of whole cloth in Amendment 43, but those irregularities are not the subject of challenge here.

This tees up an important distinction.  Plaintiffs could be arguing that it was irrational for the Service to assume that the amount of dead discards in a given year will not exceed the relevant catch projection number for dead discards.  That would be an arbitrary-and-capricious type of claim, turning on whether the facts in the record suggest that actual dead discards will exceed the Service's number—and, as a result, that overfishing is likely in fact to occur.  But that is not the claim here.[8]

Instead, Plaintiffs argue that this entire approach—calculating what would be a safe number of dead discards but then setting it aside and just assuming, or hoping, that it will not be exceeded—violates the statute.  What the Service is doing here is managing the vast majority of catch for South Atlantic red snapper *outside the annual catch limit mechanism*, relegating it to pre-2006 management.  This flies in the face of Congress's extraordinarily clear statutory mandate.

---

[8] Accordingly, Plaintiffs are not contesting how the Service reached any of its upstream numbers in the challenged actions, nor what the factual record indicates about how many dead discards are likely to occur under the challenged actions.

## III. The Text, Structure, and History of 16 U.S.C. § 1853(a)(15) Speak Clearly to the Situation at Hand

Some questions of statutory interpretation can be difficult. The relevant materials may be sparse, or Congress's intent just may be unclear.[9] The annual catch limit requirement, by contrast, is clear. The Service must:

> (15) establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

16 U.S.C. § 1853(a)(15). This command was enacted into law in a bipartisan manner, and accompanied by virtually all the possible supporting indicia of intent. Congress meant what it said and said what it meant, when it mandated annual catch limits and accountability for all federal fisheries.

### A. Annual Catch Limits are a Freestanding Requirement, Not Just a Restatement of the Act's Prohibition on Overfishing

Annual catch limit management was a well-understood concept at the time of the 2006 amendments. *See, e.g.*, S. Rep. No. 109–229, at 6 (noting U.S. Ocean Commission, regional council chairs, and others all recommending use of annual catch limits); *id.* at 7 ("Requiring routine adherence to an annual catch limit or TAC is a well-known management approach that has been utilized effectively by several Councils . . . ."); 151 Cong. Rec. S12840, S12851 (daily ed. Nov. 15, 2005)

---

[9] *See, e.g.*, *Loper Bright Enters.*, 144 S. Ct. 2244 (discussing how to approach situations where a statute is ambiguous).

(Statement of Sen. Stevens) (noting established practice of using catch limits in the North Pacific region).

The idea, Congress explained, was to set science-based limits ahead of time, then stay accountable to those limits. *See, e.g.*, S. Rep. No. 109–229, at 24 (noting new requirement would mean "establishing an annual catch limit before the fishery season begins and managing to that limit"). It was a basic budgeting tool, which, by 2006, had been shown effective in creating accountability in fishery management. *Id.* at 6 ("failure to adopt this technique more broadly has contributed to continued overfishing.").

Congress made clear that this new tool was intended to operationalize the Act's longstanding prohibition on overfishing.[10] This cause-and-effect relationship was baked into the new requirement itself: annual catch limits must be set "at a level such that overfishing does not occur." 16 U.S.C. § 1853(a)(15). It also was underscored during the adoption of the 2006 amendments. *See, e.g.*, S. Rep. No. 109–229, at 6–7 (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing

---

[10] National Standard 1 prohibits overfishing, and was part of the original Act in 1976. *See* Fishery Conservation and Management Act of 1976, Pub. L. No. 94–265, § 301(a)(1), 90 Stat. 331, 346. Specific consequences for overfishing were added in the 1996 amendments. *See* Sustainable Fisheries Act of 1996, Pub. L. No. 104–297, § 109(e), 110 Stat. 3559, 3584. Overfishing nonetheless persisted.

overfishing and rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act").

The new requirement applied to virtually all federal fisheries. *See* 16 U.S.C. § 1853 note at (2) (providing lone exception to annual catch limits, for stocks with very short life spans). It was not just for those fisheries known to have overfishing problems, or for those newly found to be subject to overfishing. Annual catch limit management was to be applied across the board.

The uniformity of the new mandate was an explicit decision by Congress, made after deliberation and debate. *See, e.g.*, S. Rep. No. 109–229, at 7 ("[S]ome regions argued that with proper accountability safeguards, effort controls could achieve the same results with less disruption to the fishery. However, the Committee concluded that explicit direction is needed to ensure accountability in all regions.").

In essence, the Service and the councils had lost their discretion to choose what kind of management they would apply to their fisheries, because for thirty years, they had failed to use that discretion responsibly. Going forward, everybody would have to use catch limit management. *See Oceana, Inc. v. Raimondo*, No. 5:21-cv-05407-VKD, Slip Op. (N.D. Cal. April 22, 2024) (noting "Congress added this requirement because it was dissatisfied with the Service's and the regional councils' exercise of discretion in the past and intended to further constrain their

ability to exceed [scientific] recommendations" (citation omitted)); *Conserv. Law Found.*, 37 F. Supp. 3d at 266 (noting the new "system was necessary because the prior regime—which was less data driven—had resulted in continued overfishing").

Congress understood this represented a major upheaval in federal fishery management. New science, data, and management infrastructure would be needed:

> The Committee heard numerous concerns that the science and data collection, including catch reporting, is not yet timely or sufficient for setting annual catch limits, particularly in a multi-species fishery. However, better and timelier data collection and reporting should result from establishing an annual catch limit before the fishery season begins and managing to that limit, as has been demonstrated in a number of fisheries.

S. Rep. No. 109–229, at 24. Congress accordingly provided funding for, and improvements to, recreational effort surveys and angler registration, as well as other aspects of science and data-gathering. *See* Pub. L. No. 109–479 §§ 201, 204, 208, 120 Stat. 3575, 3611, 3614, 3616 (2007). Congress also allowed three to four years for preparatory work, before the requirement would take effect. *See* 16 U.S.C. § 1853 note at (1).

The take-away from all this is that while annual catch limits are a tool to achieve a substantive goal—preventing overfishing—they are not optional. They are a requirement in their own right, and that requirement applies regardless of whether overfishing is occurring at the moment. *See, e.g.*, *Am. Hosp. Ass'n v.*

*Becerra*, 142 S. Ct. 1896, 1903 (2022) ("The statute therefore reflects a careful congressional focus not only on the goal . . . *but also on the appropriate means to that end*." (emphasis added)).

## B.    An Annual Catch Limit Mechanism Must Actually "Limit[]" the "Catch" of a Stock

Turning to the actual requirement, 16 U.S.C. § 1853(a)(15) instructs the Service to establish a mechanism that "limits" the "catch" in each fishery.

The word "limit[]" is used in its ordinary sense, as a value not to be exceeded.  *See, e.g.*, Merriam-Webster Online Dictionary, "Limit," https://www.merriam-webster.com/dictionary/limit (accessed July 22, 2025) ("something that bounds, restrains, or confines"); *see also Conserv. Law. Found.*, 37 F. Supp. 3d at 267 (applying dictionary meaning of "limit" to 16 U.S.C. § 1853(a)(15)).[11]

Context reinforces the ordinary meaning of "limit[]," as Congress coupled the limit with "measures to ensure accountability."  Accountability measures are precisely what makes the "limit[]" a limit:  they serve to constrain catch to that number.  *Accord Natural Res. Def. Council v. Nat'l Marine Fisheries Serv.*, 71 F.

---

[11] "Limit[]" was not defined by Congress, but only because it did not need to be. Annual catch limits were a well-understood tool by 2006, and all three words in that phrase have their ordinary meanings.  This is reflected in the widely-used synonym for annual catch limit, which is "total allowable catch" (or TAC).  *See, e.g.*, S. Rep. No. 109–229, at 7 ("Requiring routine adherence to an annual catch limit or TAC is a well-known management approach . . . .").

Supp. 3d 35, 43 (D.D.C. 2014) (noting accountability measures are "a term of art that refers to mechanisms for ensuring that the annual catch limit is not exceeded" (citations omitted)).  Accountability measures would not be necessary if the "limit[]" in 16 U.S.C. § 1853(a)(15) were intended to be a soft cap, target, or value that could be routinely exceeded.

Legislative history also reflects the word "limit[]" having its ordinary meaning.  *See, e.g.*, 151 Cong. Rec. at S12850 (statement of Sen. Ted Stevens) ("[T]his bill mandates the use of annual catch limits *which shall not be exceeded*." (emphasis added)); S. Rep. No. 109–229, at 7 (describing the catch limit mechanism as "scientifically established annual catch limits be[ing] set *and adhered to* in each managed fishery" (emphasis added)).

The word "catch," as used in 16 U.S.C. § 1853(a)(15), means all fish killed by fishing activity, whether retained and brought to shore (i.e., landings) or discarded at sea (i.e. dead discards).  This was and remains the common usage in fishery management, acknowledged by the Service in its own regulatory guidelines.  *See* 50 C.F.R. § 600.310(f)(1)(i) (defining catch as "the total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries," and specifying that "[c]atch includes fish that are retained for any purpose, as well as mortality of fish that are discarded").

Statutory structure also necessitates that "catch" encompass both landings and dead discards.  Annual catch limits are to be set "at a level such that overfishing does not occur."  16 U.S.C. § 1853(a)(15).  Both landings and dead discards are equally capable of contributing to overfishing.  *See, e.g.*, J.A._____ (SAR012002) ("[T]he primary driver of overfishing is recreational discards.").  Therefore both landings and dead discards must be included in "catch," if the ensuing limit is to be able to prevent overfishing.

Further confirmation is found in the Act as a whole.  Congress has differentiated between the global category of catch and the narrower category of landings, and used the term "landing" or "landings" when the narrower concept is intended.  *See, e.g.*, *id.* §§ 1853(a)(13), 1854(d)(2)(B), 1856 note.

Thus a close read confirms that 16 U.S.C. § 1853(a)(15) means precisely what it says:  the Service must establish a meaningful "limit[]," backed up by accountability measures, and the limit must include all relevant forms of "catch."

### C.    An Annual Catch Limit Mechanism Must Be Able To Do the Work of Preventing Overfishing

A slightly different way of approaching this is to recognize that Congress intended the annual catch limit mechanism to be effective as a freestanding management approach.  It was not a piecemeal addition to other possible management approaches, or one of several co-equal measures.  Catch limits were a one-stop shop for ending overfishing.  *See generally supra* Argument III.A.

40

This intent is reflected in the textual requirement that catch limits be set "at a level such that overfishing does not occur," 16 U.S.C. § 1853(a)(15).  Fish stocks are unitary, *see id.* § 1802(42), and overfishing determinations are made with respect to a whole stock, *see* 50 C.F.R. § 600.310(e)(2)(ii).  So if a catch limit is to be set at a level that prevents overfishing, the catch limit mechanism must be capable of creating accountability for *all* forms of catch.

In a situation where only part of the catch is governed by a catch limit mechanism, the outcome (i.e., whether or not overfishing occurs) will depend on things outside the annual catch limit.  The annual catch limit in that situation is not itself capable of ensuring that "overfishing does not occur," 16 U.S.C. § 1853(a)(15), as some portion of the work is being done elsewhere.  Had such a situation been envisioned by Congress, it would make no sense to require flatly that the catch limit be set "at a level such that overfishing *does not occur*."  *Id.* (emphasis added).

This concept derives from the statutory text, but also is common sense.  A budget that only governs credit card expenditures will not, on its own, be able to prevent overspending if a household also has substantial cash expenditures.  Lacking a limit on cash spending, the household's accountability toward preventing overspending is undermined, even if everyone adheres to the budget for credit card expenditures.

41

**IV.    The Service's Annual Catch Limit for South Atlantic Red Snapper Fails to Comply with 16 U.S.C. § 1853(a)(15)**

At this point, applying the law to the Service's annual catch limit mechanism for South Atlantic red snapper is straightforward.

The Amendment 43 catch limit mechanism, codified at 50 C.F.R. § 622.193(y), does not serve to constrain or limit dead discards of red snapper to any particular amount. *Supra* Argument II.A.  Under Amendment 43, the Service completes a stock assessment, runs catch projections, adopts the landings component as its annual catch limit, and simply drops out the dead discard component—which means dead discards are managed outside the catch limit mechanism. *Supra* Argument II.B.  Dead discards represent roughly ninety percent of the catch of South Atlantic red snapper, *see, e.g.*, J.A._____ (AR006981), meaning there is no limit or accountability provided for the vast majority of catch.

The Amendment 43 annual catch limit mechanism fails to comply with Congress's clearly stated requirement to establish a "limit[]" on the "catch" of red snapper.  16 U.S.C. § 1853(a)(15); *supra* Argument III.B.  Moreover, by excluding the majority of catch, the Service has made it impossible for the mechanism to itself ensure "that overfishing does not occur."  16 U.S.C. § 1853(a)(15); *supra* Argument III.C.  Instead, the Service continues to apply pre-2006 management to

42

dead discards, violating Congress's direct instructions to bring accountability to the fishery. *Supra* Argument III.A.

While this syllogism sounds dry, the surrounding facts are brutal. With no accountability for the vast majority of catch, South Atlantic red snapper has been subject to overfishing for decades. *Supra* Statement of the Case III. And with only landings governed by the catch limit mechanism, the Service's only lever to pull—when trying to reduce fishing mortality—has been to reduce landings. This means both sectors' allowable landings are cut and cut, while recreational dead discards continue to balloon in the absence of any accountability. Commercial fishermen are struggling to hang on, recreational anglers are dissatisfied with their short directed season, and the red snapper stock is being hammered in a way that makes long-term sustainability difficult. *See, e.g.*, 90 Fed. Reg. at 24,529 ("The current level of discards is removing younger fish from the population. This prevents a segment of the fish population from surviving to the older ages necessary to sustain the population in the long term."). This is a case study of why Congress enacted the mandate for catch limits and accountability in 2006. *Supra* Argument III.A.

The Service needs to do its job and actually "limit[]" the "catch" of South Atlantic red snapper, as required by 16 U.S.C. § 1853(a)(15). The statutory mandate is clear, and that is the end of the matter:

> When a statute commands an agency without qualification to carry out
> a particular program in a particular way, the agency's duty is clear; if

43

> it believes the statute untoward in some respect, then "it should take
> its concerns to Congress," for "[i]n the meantime it must obey [the
> statute] as written."

*Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 (D.C. Cir. 2011) (quoting *Natural Res.*

*Def. Council, Inc. v. EPA*, 643 F.3d 311, 323 (D.C. Cir. 2011)). *See also*

*Conservation Law Found.*, 37 F. Supp. 3d at 267 ("If the Service's actions violate

the plain language of the Act—regardless of whether those actions are good policy

or would otherwise be acceptable under the Service's own regulations—then that is

the end of the Court's inquiry." (citing *Burrage v. United States*, 571 U.S. 204, 218

(2014); *Atlantic City Electric Co. v. FERC*, 295 F.3d 1, 11 (D.C. Cir. 2002)).

## V.    The *A.P. Bell* Case Should Not Determine the Outcome Here

The only thing standing in the way of this being an easy case is an opinion

from a different panel of this court last year.  In *A.P. Bell Fish Co. v. Raimondo*,

commercial fishing plaintiffs challenged a reallocation of Gulf of Mexico red

grouper.  94 F.4th 60 (D.C. Cir. 2024).  From the district court level onward, the

plaintiffs levied a number of different claims, one of which invoked the annual

catch limit requirement.  *See A.P. Bell Fish Co. v. Raimondo*, No. 22-cv-1260-TJK

(D.D.C. Jan. 6, 2023) ("*A.P. Bell District Court*"), Slip Op. at 18 (listing claims).

As part of their catch limits claim, the *A.P. Bell* plaintiffs challenged the

overfishing limit, which is a regulatory creation used to determine when

overfishing is occurring.  *See supra* Argument II.B, at 30; 50 C.F.R.
§ 600.310(e)(2)(i)(D).  The plaintiffs argued the Service had failed to comply with
its own regulations by setting set the overfishing limit in landings-only units.  This
was (and had to be) a regulatory line of argument; overfishing limits are not
required or mentioned by the statute at all.  The district court resolved the issue in
favor of the Service.  *A.P. Bell District Court*, Slip Op. at 32 n.10.

Another strand within the plaintiffs' catch limit claim challenged the
Service's monitoring of recreational dead discards.  Plaintiffs argued that
monitoring was insufficient to allow for effective accountability measures, per
*Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 110 (D.D.C. 2011).  The district court
found this argument unpersuasive, given certain differences between the situations.
*See A.P. Bell District Court*, Slip Op. at 31–32.

Woven among these two specific arguments, the plaintiffs in *A.P. Bell* cited
16 U.S.C. § 1853(a)(15) in broader ways, seeming to challenge generally the
Service's approach of not setting a limit or accountability measures for dead
discards of red grouper.  The broad argument was not fleshed out, and the district
court did not find it persuasive.  The district court similarly wove broad statements
about 16 U.S.C. § 1853(a)(15) into its own opinion, in the two places where it
addressed plaintiffs' two specific catch limit arguments.  *See A.P. Bell District
Court*, Slip Op. at 32 & n.10.

45

On appeal, the plaintiffs in *A.P. Bell* renewed their catch limits claim—again challenging the Service's overfishing limit, its monitoring sufficiency, and its approach more broadly.  In a two hour oral argument, the catch limits claim was not mentioned at all.  The D.C. Circuit opinion rejected the plaintiffs' catch limits claim in two summary paragraphs:

> Title 16 U.S.C. § 1853(a)(15) provides that "[a]ny fishery management plan . . . shall . . . establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." *Id.* § 1853(a)(15).  The Act does not define "catch," but the regulatory guidelines define "catch" to include both landed fish and dead discards.  50 C.F.R. § 600.310(f)(1)(i).  Regional Councils must set an overfishing limit, defined as "the annual amount of catch that corresponds to" certain scientific estimates.  *Id.* § 600.310(e)(2)(i)(D).  Final Amendment 53 set the overfishing limit in terms of landings, not catch.  *See* 87 Fed. Reg. at 25576.  Appellants contend that this fails to establish "catch limits" or ensure accountability with them.
>
> The district court properly rejected this argument.  *A.P. Bell Fish*, 2023 WL 6159985, at *17 & n.10.  The overfishing limit recommended by the Council "accounts for all sources of mortality, including bycatch, because the stock assessment factors in that mortality.  Because the annual catch limits are based on that overfishing limit, the annual catch limits account for bycatch in the same fashion." *Id.* at *17 n.10 (internal citations omitted).  "Section 1853(a)(15) requires 'only the establishment of [annual catch limits and accountability measures] such that overfishing does not occur,'" and does not require "the further step of setting an overfishing limit . . . that more directly accounts for bycatch." *Id.* (alteration in original) (internal citations omitted).  Therefore, summary judgment to the Secretary was appropriate in that respect.

94 F.4th at 65 (quotations and omissions all in original).

The work in this passage seems to be done by the words "factor[] in" and "account[] for"—describing a relationship the court believes existed between the landings-only catch limit and dead discards. *Id.* Presumably the court was referring to the Service's catch projections for red grouper, and the fact that the landings component—which was eventually adopted as the catch limit—was calculated with a corresponding dead discards component.[12]

The first and most direct kind of relationship that the court could have been imagining is that because landings and dead discards are calculated in parallel at the catch projections stage, the landings component somehow embodies or serves as a proxy for dead discards, making it unnecessary to separately limit dead discards. The implication would be that so long as the Service's catch projections include discard mortality (which they always do, *see supra* Argument II.B), it suffices under 16 U.S.C. § 1853(a)(15) to enact only the landings component as the annual catch limit—because limiting landings also serves to limit dead discards.

In South Atlantic red snapper terms, this would be saying that because the Service ran catch projections based on SEDAR 73, and concluded that 31,000 landed fish and 207,000 dead discards together represented a safe level of fishing mortality for 2024, it was only necessary for the Service to enact the landings

---

[12] Note the dead discards component of projections can be either explicit or implicit, depending on how the stock assessment model is structured; it may have been implicit for Gulf of Mexico red grouper.

component (31,000 fish) into regulations—because doing so will ensure that dead

discards do not exceed the dead discards component (207,000 fish).

Unfortunately, this is just incorrect as a factual matter. Landings and dead

discards are independent of each other in these fisheries, so constraining one does

not inherently constrain the other. *E.g.*, J.A.\_\_\_\_ (SAR012454) ("Discards have

increased even as the length of the red snapper [open ]seasons decreased over the

last three years."). And as explained above, nothing about merely running catch

projections serves to constrain on-the-water dead discards to the levels in the

projections. *See supra* Argument II.B. The annual catch limit mechanism is what

converts the catch projection values into actual binding constraints on the fishery.

*See supra* Argument II.A. With no limit or accountability, dead discards as a

factual matter are not constrained to the projected amount.[13] Limiting landings

therefore does not render it unnecessary to limit dead discards.

The second and more nuanced way the court in *A.P. Bell* could have been

thinking about landings and dead discards is this: using the catch projections, the

Service essentially made an *assumption* that actual dead discards will not exceed

the projected amount. And it is not clear from the factual record that actual red

---

[13] This is illustrated vividly by South Atlantic red snapper. *Compare, e.g.*, J.A.\_\_\_\_ (SAR008817) (projected amount of 195,000 dead discards for 2022), *with, e.g.*, J.A.\_\_\_\_ (SAR012453, SAR012457–58) (discard and mortality rate tables that combine to show an average of 633,091 actual dead discards per year for 2018–2022).

grouper dead discards have exceeded the assumed amount in recent years.  Given that it looks like the Service's assumption has held up, there is no need to bother to enact the assumed amount of dead discards into a formal limit.

This view is suggested in the *A.P. Bell* court's remark that "Section 1853(a)(15) requires only the establishment of [annual catch limits and accountability measures] such that overfishing does not occur, and does not require the further step of setting an overfishing limit . . . that more directly accounts for bycatch."  94 F.4th at 65 (internal quotation marks omitted).[14]

The idea here is like an off-the-top deduction in budgeting:  just subtract an amount early on in your calculations, which represents your expected cash expenditures, and then do not worry about cash anymore.  Focus instead on setting a formal budget for, and actually limiting, your credit card expenditures.

In South Atlantic red snapper terms, this would mean that if no evidence suggests actual dead discards will exceed 207,000 in 2024, then the Service can just set a landings-only catch limit of 31,000 fish and be done with it.

---

[14] The district court came close to saying it directly.  *See A.P. Bell District Court*, Slip Op. at 32 ("So long as the estimates of total fishing mortality are consistent, that procedure will ensure the recreational sector stays beneath the total fishing mortality projected in the last stock assessment and incorporated into the recreational catch limit.  Lacking any reason to believe those estimates produce inconsistent results, the Court finds the accountability measures in place adequate.").

This sounds superficially reasonable, but the logic does not hold up—because the underlying premise is that the Service has an accurate idea of how many dead discards are going to occur in a future year. If the Service does not actually have the ability to predict dead discards accurately, then it becomes much less reasonable to allow the Service to make an early off-the-top deduction for dead discards and then exclude them from the annual catch limit mechanism.

From here, there are a few things to observe. First, the Service does not in fact know what amount of dead discards will occur in future years in these fisheries—either the Gulf of Mexico reef fish fishery or the South Atlantic snapper-grouper fishery. Both have large recreational sectors exerting high fishing pressure, and it is well-known that such fisheries have significant variation in dead discard levels. *See, e.g.*, J.A._____ (SAR012057) (recreational red snapper dead discards varying by more than an order of magnitude (10x), over the most recent ten years of assessment).

Second, and much more fundamentally, it was exactly this kind of "hope I'm right" approach by the Service that Congress rejected in 2006. The entire point of the annual catch limit mechanism was to set up a system that *does not rely* on such guesswork by the Service. *See supra* Argument III.A. Instead, the new system requires managers to "set hard, science-based caps on how many fish c[an] be caught each year and [] demand[s] that accountability measures be triggered when

50

fishermen exceeded those caps." *Conserv. Law Found. v. Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

Tracing the lines of accountability illustrates why. With dead discards included in the annual catch limit mechanism, accountability is direct: there is a limit, and accountability measures directly constrain dead discards to the limit and/or address problems created by overages. *See* 50 C.F.R. § 600.310(g). By contrast, if dead discards are estimated in an off-the-top deduction and excluded from the catch limit mechanism, the only accountability for a wrong guess by the Service (about how many dead discards will occur) comes after a new stock assessment is released, which is every 3-5 years or more. And even then, there are no particular consequences for the Service being wrong, unless overfishing has resulted. *Compare, e.g.*, J.A._____ (AR005053) (projection value of 37,000 dead discards in Amendment 43 for the year 2018), *with, e.g.*, J.A._____ (SAR012057) (stock assessment estimating over 833,000 actual dead discards in 2018). So when dead discards are excluded from the catch limit mechanism, accountability collapses down to just occasional overfishing determinations. This is pre-2006 management—exactly what Congress sought to eliminate in 2006. *See supra* Argument III.A.

Third and briefly, if the Service can exclude large amounts of dead discards from the annual catch limit mechanism, as it did in *A.P. Bell* and has done here,

how far does that discretion go?  Landings can end up being more constant, year-over-year, than dead discards, so perhaps the Service can "account for" landings via an off-the-top deduction as well?  There appears to be no limiting principle—at which point the Service can simply do away with the catch limit requirement entirely.

So for all these reasons, excluding substantial amounts of catch from the catch limit mechanism, as the agency has done for South Atlantic red snapper and did for Gulf of Mexico red grouper in *A.P. Bell*, is not consistent with 16 U.S.C. § 1853(a)(15).  Congress provided virtually no exceptions in 2006, and made its intent clear that the new requirement would apply across the board.  *Supra* Argument III.A.  Congress established a clear textual mandate, with corroborating legislative history, that all "catch" must have a "limit[]" and accountability.  *Supra* Argument III.B.  And Congress required catch limit mechanisms to do the work of preventing overfishing, which entails governing all major[15] sources of catch. *Supra* Argument III.C.

---

[15] Plaintiffs acknowledge there may be situations where an off-the-top approach would create less of a statutory problem, like in a fishery with very small amounts of dead discards (i.e., a few percent of the total catch), or perhaps extremely predictable amounts of dead discards (i.e., little variation from year to year). Those situations might represent less of a sidestepping of Congress's instructions in 16 U.S.C. § 1853(a)(15), if handled via an off-the-top deduction.  Those are not, however, the situation being litigated here—nor in *A.P. Bell*.

At this point, if the Court agrees this portion of *A.P. Bell* was wrongly decided, there are a few ways to proceed:

*Distinguish the Facts:*  The court in *A.P. Bell* provided no sense of scale for dead discards, and scale matters.  The principle Plaintiffs here are arguing for is that an annual catch limit mechanism must include and govern all the relevant, or substantial, forms of catch for a stock.  Neither the district court nor the court of appeals in *A.P. Bell* mentioned what proportion of red grouper total catch was coming from dead discards.  It may be that in reality dead discards represent a significant amount of Gulf of Mexico red grouper catch, but because the *A.P. Bell* courts failed to provide that information, this Court could be viewed as lacking the necessary facts to analogize from *A.P. Bell* to the situation at hand.  That might enable a different conclusion here.

*Distinguish the Law:*  The court of appeals in *A.P. Bell* presented the issue to be resolved as follows:  "Final Amendment 53 set the overfishing limit in terms of landings, not catch."  94 F.4th at 65.  Viewed narrowly, *A.P. Bell* could be characterized as holding that an overfishing limit need not be expressed in total catch units—an unsurprising result, since overfishing limits are non-statutory and have no particular requirements associated with them.  This differs from the instant litigation, where Plaintiffs are relying on the Act's text, structure, and history to challenge the annual catch limit mechanism for South Atlantic red snapper.  While

the court of appeals in *A.P. Bell* does make some broader statements about 16 U.S.C. § 1853(a)(15), those are arguably dicta given that the specific legal issue teed up for resolution was non-statutory. *See, e.g.*, *Li v. Comm'r of Internal Revenue*, 22 F.4th 1014, 1018 (D.C. Cir. 2022) (finding broad statement from prior case "is not a holding concerning the issue in the present case").

 *No Applicable Principle:*  The *A.P. Bell* case also might be cabined because it only provides two summary paragraphs on catch limits, with no clearly stated reasoning or principle that can be applied going forward. *Cf. United States v. Weaver*, 808 F.3d 26, 36 (D.C. Cir. 2015) ("It should go without saying that a holding can be understood only by reference to the context of the case in which it was rendered." (citation omitted)).  Plaintiffs here—in briefing—have filled in the main possible forms of logic that the *A.P. Bell* court could have implicitly been relying on, in order to refute them.  But the actual discussion of catch limits in the opinion is extremely short, consisting mostly of re-quotes from the district court (which itself quoted cases from somewhat different contexts).  There was no reference to, much less actual analysis of, statutory text, structure, or history.  Because these two paragraphs of *A.P. Bell* more resemble a summary disposition than a precedential opinion, *see* D.C. Circuit Local Rule 36(d), they might be treated as such and limited to their facts.  *Cf. Illinois State Board of Elections v.*

*Socialist Workers Party*, 440 U.S. 173, 180–82 (1979) (noting, in Supreme Court context, that summary dispositions create little precedent).

*Irons Footnote:* If *A.P. Bell* is not viewed as distinguishable, Plaintiffs respectfully believe this could be an appropriate situation for an *Irons* footnote. The Court's criteria for use "include, but are not necessarily limited to: . . . (2) rejecting a prior statement of law which, although arguably dictum, warrants express rejection to avoid future confusion." U.S. Court of Appeals for the D.C. Circuit, Policy Statement on *En Banc* Endorsement of Panel Decisions (Jan. 17, 1996), at 1 ("Policy Statement"). The *A.P. Bell* remarks about annual catch limits are arguably dicta (as noted two paragraphs above), yet they create significant potential for future confusion. They suggest dead discards—and perhaps landings as well, by extension—do not need to be included in an annual catch limit mechanism, so long as the Service has conducted catch projections and believes actual catch will not exceed the projections. This is an indefensible view of 16 U.S.C. § 1853(a)(15), reached with no apparent consideration of statutory text, structure, or history, and it could lead future courts astray. *See, e.g.*, *Chung v. U.S. Dep't of Justice*, 333 F.3d 273, 278 n.* (D.C. Cir. 2003) (overruling via *Irons* footnote a prior summary disposition that had failed to consider a relevant source of law).

*En Banc Review:*  If not appropriate for an *Irons* footnote, Plaintiffs would pursue overruling of *A.P. Bell* via *en banc* review.  This panel itself could request "full *en banc* hearing and disposition of an appeal in lieu of issuing a panel decision," Policy Statement at 3; absent that, Plaintiffs would seek review via petition.  If review were granted, Plaintiffs believe the stare decisis weight of *A.P. Bell* would be minimal.  *See Loper Bright Enters.*, 144 S. Ct. at 2270 (noting relevant stare decisis considerations include "the quality of the precedent's reasoning, the workability of the rule it established, and reliance on the decision" (cleaned up)).  That said, Plaintiffs are aware of the virtually insurmountable *en banc* standard, and we urge the Court to adopt one of the alternative approaches above instead.

## VI.    The 1990 Amendments Render This Case Timely

In the district court, the Service argued Plaintiffs' case was untimely insofar as it challenged Amendment 43.  The district court, after providing some unhelpful dicta, eventually declined to rule on the issue.  J.A.\_\_\_\_\_ (ECF 44 at 23–26) (holding timeliness is not jurisdictional under the Act); *but see A.P. Bell District Court*, Slip Op. at 18 (holding the opposite).

Plaintiffs' challenge to Amendment 43 is timely, based on the express statutory re-opener provisions added by Congress in 1990.  *See* Fishery

Conservation Amendments of 1990, Pub. L. No. 101–627, § 111(b), 104 Stat. 4436, 4452–53.  The definitive treatment of this issue was provided by Judge Fletcher in *Oregon Trollers Ass'n v. Gutierrez*, 452 F.3d 1104, 1113–14 (9th Cir. 2006); *see also Gulf Fishermen's Association v. Gutierrez*, 529 F.3d 1321, 1322 (11th Cir. 2008).

Under 16 U.S.C. § 1855(f) as amended, Plaintiffs challenged an "action" in the form of the 2023 Temporary Rule, which implemented a "regulation" in the form of the Amendment 43 final rule.  This is precisely the situation provided for by Congress in the 1990 Amendments, and it renders Amendment 43 a valid subject for challenge.  *See Oregon Trollers*, 452 F.3d at 1113–14.  Plaintiffs encourage this Court to join the two other circuits with clear rulings on timeliness that recognize the 1990 statutory amendments.

## CONCLUSION

For the foregoing reasons, the Court should reverse the district court's grant of summary judgment to the Service and declare that the annual catch limit mechanism established by Amendment 43 and codified at 50 C.F.R. § 622.193(y) violates the Magnuson-Stevens Act.  The Court further should vacate the existing regulatory text and order the Service to establish a legally-compliant mechanism for annual catch limits, with measures to ensure accountability, by a date certain.

Dated:  July 28, 2025          Respectfully submitted,

/s/ Seth Atkinson
Seth L. Atkinson
CADC Bar No. 65869
Quillback Consulting
348 Nobel Drive
Santa Cruz, CA 95060
(203) 331-2792
seth@quillbackconsulting.com

*Attorney for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

In accordance with Rule 32(g) of the Federal Rules of Appellate Procedure, undersigned counsel certifies that the attached Opening Brief of Appellants complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6), as it was prepared in a proportionally spaced typeface using Microsoft Word for Mac v.16.97.2, with 14-point Times New Roman font and double spacing.

Undersigned counsel further certifies that the document complies with the word limit in Fed. R. App. P. 32(a)(7)(B), as it contains 12,981 words, excluding the items specified in Fed. R. App. P. 32(f) and D.C. Circuit Rule 32(e)(1). Microsoft Word was used to conduct the word count.

Dated:  July 28, 2025

Respectfully submitted,

/s/ Seth Atkinson
Seth L. Atkinson
CADC Bar No. 65869
Quillback Consulting
348 Nobel Drive
Santa Cruz, CA 95060
(203) 331-2792
seth@quillbackconsulting.com

*Attorney for Appellants*

# ADDENDUM

Administrative Procedure Act

   5 U.S.C. § 706 ........................................................................... A-2


Magnuson-Stevens Fishery Conservation and Management Act

   16 U.S.C. § 1802 ....................................................................... A-3

   16 U.S.C. § 1853 ....................................................................... A-4

   16 U.S.C. § 1853 note ............................................................... A-5

   16 U.S.C. § 1855 ....................................................................... A-6


National Marine Fisheries Service Regulations

National Standard Guidelines

   50 C.F.R. § 600.310 .......................................................... A-7

Snapper-Grouper Fishery of the South Atlantic Region

   50 C.F.R. § 622.193 (2018)............................................... A-10

   Comparison Chart for 50 C.F.R. § 622.193(y) .............................A-11

**Administrative Procedure Act**

**5 U.S.C. § 706 – SCOPE OF REVIEW**

To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

. . .

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

. . .

## Magnuson-Stevens Fishery Conservation and Management Act
## 16 U.S.C. § 1802 – DEFINITIONS

As used in this Act, unless the context otherwise requires—

. . .

(33) The term "optimum", with respect to the yield from a fishery, means the amount of fish which—

> (A) will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems;

> (B) is prescribed as such on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant economic, social, or ecological factor; and

> (C) in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery.

(34) The terms "overfishing" and "overfished" mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis.

. . .

(42) The term "stock of fish" means a species, subspecies, geographical grouping, or other category of fish capable of management as a unit.

. . .

**Magnuson-Stevens Fishery Conservation and Management Act**

**16 U.S.C. § 1853 – CONTENTS OF FISHERY MANAGEMENT PLANS**

(a) REQUIRED PROVISIONS.— Any fishery management plan which is prepared by any Council, or by the Secretary, with respect to any fishery, shall—

. . .

(15) establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability.

. . .

**Magnuson-Stevens Fishery Conservation and Management Act**

**16 U.S.C. § 1853 note – EFFECTIVE DATES; APPLICATION TO CERTAIN SPECIES**

The amendment made by subsection (a)(10)16—

(1) shall, unless otherwise provided for under an international agreement in which the United States participates, take effect—

(A) in fishing year 2010 for fisheries determined by the Secretary to be subject to overfishing; and

(B) in fishing year 2011 for all other fisheries; and

(2) shall not apply to a fishery for species that have a life cycle of approximately 1 year unless the Secretary has determined the fishery is subject to overfishing of that species; and

(3) shall not limit or otherwise affect the requirements of section 301(a)(1) or 304(e) of the Magnuson-Stevens Fishery Conservation and Management Act (16 U.S.C. 1851(a)(1) or 1854(e), respectively).

**Magnuson-Stevens Fishery Conservation and Management Act**

**16 U.S.C. § 1855 – OTHER REQUIREMENTS AND AUTHORITY**

. . .

(f) JUDICIAL REVIEW.—

(1) Regulations promulgated by the Secretary under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, chapter 7 of title 5, United States Code, if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; except that—

(A) section 705 of such title is not applicable, and

(B) the appropriate court shall only set aside any such regulation or action on a ground specified in section 706(2)(A), (B), (C), or (D) of such title.

(2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

(3)    (A) Notwithstanding any other provision of law, the Secretary shall file a response to any petition filed in accordance with paragraph (1), not later than 45 days after the date the Secretary is served with that petition, except that the appropriate court may extend the period for filing such a response upon a showing by the Secretary of good cause for that extension.

(B) A response of the Secretary under this paragraph shall include a copy of the administrative record for the regulations that are the subject of the petition.

(4) Upon a motion by the person who files a petition under this subsection, the appropriate court shall assign the matter for hearing at the earliest possible date and shall expedite the matter in every possible way.

**National Marine Fisheries Service Regulations**

**National Standard Guidelines**

**50 C.F.R. § 600.310 – NATIONAL STANDARD 1—OPTIMUM YIELD**


(a) Standard 1. Conservation and management measures shall prevent overfishing while achieving, on a continuing basis, the optimum yield (OY) from each fishery for the U.S. fishing industry.

. . .

(e) Features of MSY, SDC, and OY—

    . . .

    (2) Status determination criteria—

        (i) Definitions.

            (A) Status determination criteria (SDC) mean the measurable and objective factors, MFMT, OFL, and MSST, or their proxies, that are used to determine if overfishing has occurred, or if the stock or stock complex is overfished. Magnuson-Stevens Act (section 3(34)) defines both "overfishing" and "overfished" to mean a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the MSY on a continuing basis. To avoid confusion, this section clarifies that "overfished" relates to biomass of a stock or stock complex, and "overfishing" pertains to a rate or level of removal of fish from a stock or stock complex.

            (B) Overfishing occurs whenever a stock or stock complex is subjected to a level of fishing mortality or total catch that jeopardizes the capacity of a stock or stock complex to produce MSY on a continuing basis.

            (C) Maximum fishing mortality threshold (MFMT) means the level of fishing mortality (i.e. F), on an annual basis, above which overfishing is occurring. The MFMT or reasonable proxy may be expressed either as a single number (a fishing mortality

rate or F value), or as a function of spawning biomass or other measure of reproductive potential.

(D) Overfishing limit (OFL) means the annual amount of catch that corresponds to the estimate of MFMT applied to a stock or stock complex's abundance and is expressed in terms of numbers or weight of fish.

(E) Overfished. A stock or stock complex is considered "overfished" when its biomass has declined below MSST.

(F) Minimum stock size threshold (MSST) means the level of biomass below which the capacity of the stock or stock complex to produce MSY on a continuing basis has been jeopardized.

. . .

(ii) Specification of SDC and overfishing and overfished determinations. Each FMP must describe how objective and measurable SDCs will be specified, as described in paragraphs (e)(2)(ii)(A) and (B) of this section. To be measurable and objective, SDC must be expressed in a way that enables the Council to monitor the status of each stock or stock complex in the FMP. Applying the SDC set forth in the FMP, the Secretary determines if overfishing is occurring and whether the stock or stock complex is overfished (Magnuson-Stevens Act section 304(e)). SDCs are often based on fishing rates or biomass levels associated with MSY or MSY based proxies. . . .

(A) SDC to Determine Overfishing Status. Each FMP must specify a method used to determine the overfishing status for each stock or stock complex. . . .

. . .

(f) Acceptable biological catch and annual catch limits.

(1) Definitions.—

(i) Catch is the total quantity of fish, measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and other fisheries. Catch includes fish that are retained for any purpose, as well as mortality of fish that are discarded.

(ii) Acceptable biological catch (ABC) is a level of a stock or stock complex's annual catch, which is based on an ABC control rule that accounts for the scientific uncertainty in the estimate of OFL, any other scientific uncertainty, and the Council's risk policy.

(iii) Annual catch limit (ACL) is a limit on the total annual catch of a stock or stock complex, which cannot exceed the ABC, that serves as the basis for invoking AMs. An ACL may be divided into sector-ACLs (see paragraph (f)(4) of this section).

. . .

(4) Setting the annual catch limit—

(i) General. ACL cannot exceed the ABC and may be set annually or on a multiyear plan basis. ACLs in coordination with AMs must prevent overfishing (see MSA section 303(a)(15)). If an Annual Catch Target (ACT), or functional equivalent, is not used, management uncertainty should be accounted for in the ACL. . . . .

. . .

(g) Accountability measures (AMs).

(1) Introduction. AMs are management controls to prevent ACLs, including sector-ACLs, from being exceeded, and to correct or mitigate overages of the ACL if they occur. AMs should address and minimize both the frequency and magnitude of overages and correct the problems that caused the overage in as short a time as possible. NMFS identifies two categories of AMs, inseason AMs and AMs for when the ACL is exceeded. The FMP should identify what sources of data will be used to implement AMs (e.g., inseason data, annual catch compared to the ACL, or multi-year averaging approach).

. . .

A-9

**National Marine Fisheries Service Regulations**

**Snapper-Grouper Fishery of the South Atlantic Region**

**50 C.F.R. § 622.193 (2018)**

. . .

(y) Red snapper —

(1) Commercial sector.  The commercial ACL for red snapper is 124,815 lb (56,615 kg), round weight. See § 622.183(b)(5) for details on the commercial fishing season.  NMFS will monitor commercial landings during the season, and if commercial landings, as estimated by the SRD, reach or are projected to reach the commercial ACL, the AA will file a notification with the Office of the Federal Register to close the commercial sector for red snapper for the remainder of the year.  On and after the effective date of the closure notification, all sale or purchase of red snapper is prohibited and harvest or possession of red snapper is limited to the recreational bag and possession limits and only during such time as harvest by the recreational sector is allowed as described in § 622.183(b)(5).  This bag and possession limit and the prohibition on sale / purchase apply in the South Atlantic on board a vessel for which a valid Federal commercial or charter vessel / headboat permit for South Atlantic snapper-grouper has been issued, without regard to where such species were harvested or possessed, i.e., in state or Federal waters.

(2) Recreational sector.  The recreational ACL for red snapper is 29,656 fish.  The AA will file a notification with the Office of the Federal Register to announce the length of the recreational fishing season for the current fishing year.  The length of the recreational fishing season for red snapper serves as the in-season accountability measure. See § 622.183(b)(5) for details on the recreational fishing season.  On and after the effective date of the recreational closure notification, the bag and possession limits for red snapper are zero.

**National Marine Fisheries Service Regulations**

**Snapper-Grouper Fishery of the South Atlantic Region**

**Comparison Chart for 50 C.F.R. § 622.193(y)**

A chart on the following page provides the relevant versions of regulatory text at 50 C.F.R. § 622.193(y), which is where the South Atlantic red snapper annual catch limit mechanism is located.

- The first column shows Amendment 28, which was the status quo before the challenged action in this case.

- The second column shows Amendment 43, which is the challenged regulation in this case.

- The third column shows the 2024 Temporary Rule, which displaced Amendment 43 for six months, and whose content was added via a temporary new subsection (aa) at the end of section 193.  The 2024 Temporary Rule was also challenged in this case.

- The fourth column shows Amendment 59, which post-dates the district court decision in this case, and represents the most current version of regulatory text.

Note that in this chart, Amendment 43 is set as the baseline—meaning differences relative to Amendment 43 are highlighted in bold/red text.

| Amendment 28 | Amendment 43 | 2024 Temporary Rule | Amendment 59 |
|---|---|---|---|
| 50 C.F.R. 622.193(y) | 50 C.F.R. 622.193(y) | 50 C.F.R. 622.193(aa) | 50 C.F.R. 622.193(y) |
| 78 Fed. Reg. 44,461 (July 24, 2013) | 83 Fed. Reg. 35,428 (July 26, 2018) | 89 Fed. Reg. 50,530 (June 14, 2024) | 90 Fed. Reg. 24,527 (June 11, 2025) |
| (y) Red snapper — (1) Commercial sector. The commercial ACL for red snapper is **zero. However, if NMFS determines that the previous year's estimated red snapper landings and dead discards are less than the ABC, limited red snapper harvest and possession may be allowed for the current fishing year and the commercial ACL value would be determined using the formula described in the FMP. The AA will file a notification with the Office of the Federal Register to announce the limited commercial ACL for the current fishing year.** NMFS will monitor commercial landings during the **limited** season, and if commercial landings, as | (y) Red snapper — (1) Commercial sector. The commercial ACL for red snapper is 124,815 lb (56,615 kg), round weight. See § 622.183(b)(5) for details on the commercial fishing season. NMFS will monitor commercial landings during the season, and if commercial landings, as estimated by the SRD, reach or are projected to reach the commercial ACL, the AA will file a notification with the Office of the Federal Register to close the commercial sector for | (aa) Red snapper — (1) Commercial sector. The commercial ACL for red snapper is **85,268** lb (**38,677** kg), round weight. See § 622.183(b)(5) for details on the commercial fishing season. NMFS will monitor commercial landings during the season, and if commercial landings, as estimated by the SRD, reach or are projected to reach the commercial ACL, the AA will file a notification with the Office of the Federal Register to close the commercial sector for | (y) Red Snapper — (1) Commercial sector. The commercial ACL for red snapper is **102,951** lb (**46,698** kg), round weight. See § 622.183(b)(5) for details on the commercial fishing season. NMFS will monitor commercial landings during the season, and if commercial landings, as estimated by the SRD, reach or are projected to reach the commercial ACL, the AA will file a notification with the Office of the Federal Register to close the commercial sector for |

A-12

| Amendment 28 | Amendment 43 | 2024 Temporary Rule | Amendment 59 |
|---|---|---|---|
| estimated by the SRD, reach or are projected to reach the commercial ACL, **based on the formula described in the FMP,** the AA will file a notification with the Office of the Federal Register to close the commercial sector for red snapper for the remainder of the year. On and after the effective date of the closure notification, all sale or purchase of red snapper is prohibited and harvest or possession of red snapper is limited to **the bag** and possession **limits**. This bag and possession limit and the prohibition on sale / purchase apply in the South Atlantic on board a vessel for which a valid Federal commercial or charter vessel / headboat permit for South Atlantic snapper-grouper has been issued, without regard to where such species were harvested or | red snapper for the remainder of the year. On and after the effective date of the closure notification, all sale or purchase of red snapper is prohibited and harvest or possession of red snapper is limited to the recreational bag and possession limits and only during such time as harvest by the recreational sector is allowed as described in § 622.183(b)(5). This bag and possession limit and the prohibition on sale / purchase apply in the South Atlantic on board a vessel for which a valid Federal commercial or charter vessel / headboat permit for South Atlantic | red snapper for the remainder of the year. On and after the effective date of the closure notification, all sale or purchase of red snapper is prohibited and harvest or possession of red snapper is limited to the recreational bag and possession limits and only during such time as harvest by the recreational sector is allowed as described in § 622.183(b)(5). This bag and possession limit and the prohibition on sale / purchase apply in the South Atlantic on board a vessel for which a valid Federal commercial or charter vessel / headboat permit for South Atlantic | red snapper for the remainder of the year. On and after the effective date of the closure notification, all sale or purchase of red snapper is prohibited and harvest or possession of red snapper is limited to the recreational bag and possession limits and only during such time as harvest by the recreational sector is allowed as described in § 622.183(b)(5). This bag and possession limit and the prohibition on sale / purchase apply in the South Atlantic on board a vessel   for which a valid Federal commercial or charter vessel/headboat permit for South Atlantic |

| Amendment 28 | Amendment 43 | 2024 Temporary Rule | Amendment 59 |
|---|---|---|---|
| possessed, i.e., in state or Federal waters.<br>(2) Recreational sector. The recreational ACL for red snapper is **zero**. **However, if NMFS determines that the previous year's estimated red snapper landings and dead discards are less than the ABC, limited red snapper harvest and possession may be allowed for the current fishing year and the recreational ACL value would be determined using the formula described in the FMP.** The AA will file a notification with the Office of the Federal Register to announce the **limited recreational ACL and the** length of the recreational fishing season for the current fishing year. The length of the recreational fishing season for red snapper serves as the in-season accountability measure. See § 622.183(b)(5) for details on the recreational fishing | snapper-grouper has been issued, without regard to where such species were harvested or possessed, i.e., in state or Federal waters.<br>(2) Recreational sector. The recreational ACL for red snapper is 29,656 fish. The AA will file a notification with the Office of the Federal Register to announce the length of the recreational fishing season for the current fishing year. The length of the recreational fishing season for red snapper serves as the in-season accountability measure. See § 622.183(b)(5) for details on the recreational fishing season. On and after the | snapper-grouper has been issued, without regard to where such species were harvested or possessed, i.e., in state or Federal waters.<br>(2) Recreational sector. The recreational ACL for red snapper is **21,167** fish. The AA will file a notification with the Office of the Federal Register to announce the length of the recreational fishing season for the current fishing year. The length of the recreational fishing season for red snapper serves as the in-season accountability measure. See § 622.183(b)(5) for details on the recreational fishing season. On and after the | snapper-grouper has been issued, without regard to where such species were harvested or possessed, i.e., in state or Federal waters.<br>(2) Recreational sector. The recreational ACL for red snapper is **22,797** fish. The AA will file a notification with the Office of the Federal Register to announce the length of the recreational fishing season for the current fishing year. The length of the recreational fishing season for red snapper serves as the in-season accountability measure. See § 622.183(b)(5) for details on the recreational fishing season. On and after the |

A-14

| Amendment 28 | Amendment 43 | 2024 Temporary Rule | Amendment 59 |
|---|---|---|---|
| season. On and after the effective date of the recreational closure notification, the bag and possession limits for red snapper are zero. | effective date of the recreational closure notification, the bag and possession limits for red snapper are zero. | effective date of the recreational closure notification, the bag and possession limits for red snapper are zero. | effective date of the recreational closure notification, the bag and possession limits for red snapper are zero. |